UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

SAMUEL K. DOGBE,

            Plaintiff,           **MEMORANDUM AND ORDER**

   -against-                 11-CV-6289(KAM)(LB)

DELTA AIR LINES, INC., JOHN DOE,
KONINKLIJKE LUCHTVAART MAATSCHAPPIJ,
N.V. aka KLM ROYAL DUTCH AIRLINES,
PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, JANE DOE 1, in her individual
and official capacities, and JANE
DOE 2, in her individual and official
capacities,

            Defendants.

-------------------------------------X

**MATSUMOTO, United States District Judge:**

       On December 23, 2011, plaintiff Samuel K. Dogbe
("plaintiff") filed the instant action against defendants Delta
Air Lines, Inc. ("Delta"), Koninklijke Luchtvaart Maatschappij,
N.V., also known as KLM Royal Dutch Airlines ("KLM"), the Port
Authority of New York and New Jersey ("the Port Authority"),
John Doe, Jane Doe 1, and Jane Doe 2. (ECF No. 1, Compl.) On
April 16, 2012, plaintiff filed an Amended Complaint. (ECF No.
13, Am. Compl.) In his Amended Complaint, plaintiff seeks money
damages and declaratory and injunctive relief to redress his
alleged false arrest, unlawful search and seizure, unreasonable
force, bodily injury, and intentional and negligent infliction

of emotional distress at the hands of defendants in violation of the Constitution and laws of the United States and the State of New York, and the common law. (*See id.* ¶ 1.)

Presently before the court are defendants Delta and KLM's motions to dismiss the Amended Complaint. For the reasons discussed below, the court hereby grants defendants' motions to dismiss in their entirety.

## BACKGROUND[1]

## I.   Plaintiff's Travels on December 29, 2010

On December 29, 2010, plaintiff, a 71-year-old man, was scheduled to travel from Norfolk, Virginia, to Accra, Ghana, via a connecting flight at New York City's John F. Kennedy Airport ("JFK"). (*Id.* ¶¶ 4, 11.) Plaintiff's flight from Norfolk to JFK aboard Delta Flight 166 was delayed, thereby causing plaintiff to miss his connecting flight from JFK to Accra. (*Id.* ¶¶ 11, 12.) Plaintiff was then required to stand in line for approximately three hours at JFK while he attempted to be reassigned to a new flight to Accra by Delta. (*Id.* ¶ 13.) During this time, plaintiff experienced pain and discomfort in his legs that was exacerbated by Delta's failure to offer plaintiff a place to sit and the day's cold weather. (*Id.* ¶¶ 13-14.) After the three-hour wait, Delta provided plaintiff

---

[1] The following facts, taken from plaintiff's Amended Complaint, documents incorporated by reference into the Amended Complaint, and documents within the purview of judicial notice, are assumed to be true for the purposes of defendants' motions to dismiss.

with a written voucher for a return flight from JFK back to
Norfolk on December 29th, as well as for a new flight from
Norfolk to Accra via JFK on January 2, 2011.  (*Id.* ¶ 15.)
Plaintiff thereafter returned to Norfolk on December 29, 2010.
(*See id.*)

## II.  <u>Plaintiff's Travels on January 2, 2011</u>

### A.  Plaintiff's Interactions with Delta

On January 2, 2011, plaintiff again flew from Norfolk
to JFK aboard Delta Flight 166.  (*Id.* ¶ 16.)  Due to lingering
pain in his legs as the result of his three-hour wait in line on
December 29th, on January 2nd plaintiff requested and received
wheelchair assistance from Delta at Norfolk and JFK.  (*Id.* ¶
17.)  After a long wait in a wheelchair at JFK, plaintiff was
eventually transported to his assigned seat in the rear of the
4:15 p.m. Delta flight to Accra.  (*Id.* ¶ 18.)

Once seated, plaintiff continued to experience
discomfort in his legs due to the December 29th wait and the
extended period during which plaintiff sat in a wheelchair prior
to boarding the flight to Accra.  (*Id.*)  As the result of his
discomfort, plaintiff asked an unidentified male member of
Delta's flight crew whether seating with more leg room was
available to allow plaintiff to stretch his legs so that his
"blood could flow properly."  (*Id.* ¶ 19.)  The male crewmember
advised plaintiff that no such seating was available.  (*Id.* ¶

3

20.)

Shortly thereafter, another passenger who witnessed plaintiff's conversation pointed out seemingly available seats with additional legroom. (*Id.* ¶ 21.) After asking the same male Delta crewmember whether these seats were in fact available, the agent rhetorically asked plaintiff, "Do you know how much those seats cost?" and immediately answered that, "Each of those seats costs $5,000," and that the seats were "only for the flight crew." (*Id.* ¶¶ 22-23.) Plaintiff was unsure whether the male crewmember meant that plaintiff could only sit in one of the identified seats if he paid $5,000. (*Id.* ¶ 24.) Seeking clarification of the male crewmember's statements, plaintiff next asked whether he could "share" the seats with the flight crew. (*Id.* ¶ 25.) Rather than responding to plaintiff, the male crewmember turned and walked away. (*Id.* ¶ 26.)

Shortly thereafter, an unidentified female Delta crewmember approached plaintiff and stated, "If you can't sit in your assigned seat, you may have to get off the plane," before walking away without further explanation. (*Id.* ¶ 27.) Plaintiff was confused by the female crewmember's warning.[2] (*Id.*

---

[2] In its Memorandum of Law in Support of Delta's Motion to Dismiss ("Delta Mem."), Delta posits that "one can reasonably infer from what little plaintiff has said, that he had taken a seat that was more to his liking than the 'assigned seat' to which the [female crewmember] was referring, and if he were unwilling to sit in his *assigned* seat he might need to disembark." (ECF No. 36-2 at 4 n.8 (emphasis in original).) The court, however, declines, as it must, to infer or assume any facts not contained in plaintiff's Amended Complaint for purposes of the instant motions to dismiss.

¶ 28).

A few minutes later, an unknown male Delta employee, identified in the Amended Complaint as "John Doe," approached plaintiff and demanded that plaintiff follow him on foot to the front of the plane, despite John Doe having been aware that plaintiff boarded the plane by wheelchair. (*Id.* ¶ 29.) Despite his discomfort, plaintiff complied with John Doe's demand and walked to the front of the plane. (*Id.* ¶ 30.) Upon plaintiff's arrival at the front of the plane, John Doe stated, "I agree one-hundred percent with [the female crewmember]," but did not explain to plaintiff what the female crewmember had said to John Doe. (*Id.* ¶ 31.) When plaintiff inquired as to what he did wrong, John Doe demanded that plaintiff "get off the plane." (*Id.* ¶ 32.) Plaintiff then urged that he did not understand why he was being asked to deplane, to which John Doe stated that it was because of plaintiff's "attitude." (*Id.* ¶ 33.) Plaintiff then asked John Doe what he meant by plaintiff's "attitude," at which point John Doe summoned the Port Authority Police. (*Id.* ¶ 34-35.) Thereafter, John Doe summoned several unnamed Delta ground crew employees, who "began to gather into a mob and proceeded to rankle and yell at plaintiff, trying to chide him into leaving the plane without explanation or cause." (*Id.* ¶ 36.) During this time, one of the unnamed ground crew employees boarded the plane, grabbed plaintiff's arm, and began physically

assaulting him. (*Id.*)

Soon thereafter, two female Port Authority Police Officers, identified in the Amended Complaint as "Jane Doe 1" and "Jane Doe 2," approached plaintiff in an "unreasonably frightening, hostile[,] and aggressive manner," that made plaintiff believe that he was not free to leave the area. (*See id.* ¶¶ 38-39.) As the officers approached, plaintiff attempted to calm the Delta employees by advising them that he merely wanted a seating accommodation for his disability.[3] (*Id.* ¶ 41.)

Plaintiff then stated that he was a loyal Delta customer and member of Delta's "Sky Miles Club." (*Id.* ¶ 42.) Plaintiff next attempted to display his Sky Miles Club membership card, at which point either Jane Doe 1 or Jane Doe 2 forcefully struck plaintiff's hand in an apparent attempt to knock the membership card out of his hand. (*Id.* ¶ 42-43.) While remaining calm, plaintiff asked the police officers why his hand had been struck. (*Id.* ¶ 44.) One or both of the police officers then forcefully tackled plaintiff to the ground. (*Id.*) While plaintiff was lying face-down on the ground, one or both of the police officers sat on plaintiff, which caused his rib to fracture, and a neck injury. (*Id.*)

Jane Doe 1 and Jane Doe 2 then handcuffed plaintiff

---

[3] The Amended Complaint mentions plaintiff's disability for the first time in paragraph 25, but the disability is not identified. (*See* Am. Compl. ¶ 25.)

and proceeded to search him and his personal property.  (*Id.* ¶ 45.)  During this time, plaintiff's handcuffs became increasingly tight, thereby causing plaintiff pain and suffering.  (*Id.*)  Upon bringing this fact to the attention of Jane Doe 1 and Jane Doe 2, the police officers ignored plaintiff's pleas to loosen his handcuffs.  (*Id.*)  Plaintiff was then dragged from the plane by the police officers and placed in a wheelchair while still handcuffed.  (*Id.* ¶ 46.)  As plaintiff was being removed from the plane, John Doe told plaintiff that he was "banned" from flying on Delta for one year.  (*Id.* ¶ 100.)

For an unspecified but "significant" period of time thereafter, plaintiff was interrogated by the police officers, during which time he remained handcuffed.  (*Id.* ¶ 50.)  Plaintiff was repeatedly asked if he had been drinking or using drugs, to which he replied that he had been doing neither.  (*Id.* ¶¶ 48-50.)

Plaintiff was eventually released by the Port Authority Police later that same day, after which plaintiff was taken by ambulance to the emergency room of Jamaica Hospital in Queens.  (*Id.* ¶¶ 50-51, 100.)  Plaintiff was examined, treated, and released that same day.  (*See id.* ¶ 51.)  Plaintiff continued to suffer great pain from his injuries after being released from the hospital.  (*Id.* ¶ 52.)

Upon subsequent examination of plaintiff on another

date by his family physician, plaintiff was diagnosed with a
fractured rib and a "serious" neck injury. (*See id.* ¶¶ 52-55.)
Additionally, plaintiff's wrists were bruised, some of his
clothing and personal items were soiled, torn, or otherwise
damaged, and he suffered embarrassment, humiliation, anxiety,
stress, and emotional distress. (*Id.* ¶¶ 56-57.) Plaintiff
continues to receive medical treatment and therapy for his
injuries. (*Id.* ¶ 57.)

        According to plaintiff, since his forceful removal
from the Delta flight to Accra, Delta has refused to provide
plaintiff with a copy of an incident report or any other
explanation of its decision to remove plaintiff from the plane.
(*Id.* ¶ 102.)

    **B.  Plaintiff's Interactions with KLM**

        Following his release from the Jamaica Hospital
emergency room on January 2, 2011, plaintiff returned to JFK to
attempt to obtain another flight to Accra. (*Id.* ¶ 100.) At
JFK, plaintiff attempted to purchase a ticket aboard a KLM
flight to Accra; however, a KLM sales agent refused to sell
plaintiff a ticket and told him that "the system would not allow
it because of an entry by Delta." (*Id.*) At this time,
plaintiff also learned that KLM and Delta are partners in an
international alliance known as "SkyTeam." (*See id.*)

## III. **The Instant Action**

### A. **Plaintiff's Claims**

Plaintiff's Amended Complaint contains the following twenty-two claims:

**First Claim:** Violation of plaintiff's constitutional rights under color of law pursuant to 42 U.S.C. § 1983 against Jane Doe 1 and Jane Doe 2. (*Id.* ¶¶ 58-59.)

**Second Claim:** Assault against Jane Doe 1 and Jane Doe 2. (*Id.* ¶¶ 60-61.)

**Third Claim:** Battery against Jane Doe 1 and Jane Doe 2. (*Id.* ¶¶ 62-63.)

**Fourth Claim:** False arrest and imprisonment against Jane Doe 1 and Jane Doe 2. (*Id.* ¶¶ 64-65.)

**Fifth Claim:** Intentional infliction of emotional distress against Jane Doe 1 and Jane Doe 2. (*Id.* ¶¶ 66-67.)

**Sixth Claim:** Negligent infliction of emotional distress against Jane Doe 1 and Jane Doe 2. (*Id.* ¶¶ 68-69.)

**Seventh Claim:** Negligence against Jane Doe 1 and Jane Doe 2. (*Id.* ¶¶ 70-71.)

**Eighth Claim:** Violation of plaintiff's constitutional rights under color of law pursuant to 42 U.S.C. § 1983 against the Port Authority. (*Id.* ¶¶ 72-77.)

**Ninth Claim:** Respondeat superior liability for the actions of Jane Doe 1 and Jane Doe 2 against the Port Authority. (*Id.* ¶¶ 78-79.)

**Tenth Claim:** Violation of plaintiff's constitutional rights under color of law pursuant to 42 U.S.C. § 1983 against John Doe. (*Id.* ¶¶ 80-82.)

**Eleventh Claim:** Assault against John Doe. (*Id.* ¶¶ 83-84.)

**Twelfth Claim:** Battery[4] against John Doe.  (*Id.* ¶¶ 85-86.)

**Thirteenth Claim:** False imprisonment against John Doe. (*Id.* ¶¶ 87-88.)

**Fourteenth Claim:** Intentional infliction of emotional distress against John Doe.  (*Id.* ¶¶ 89-90.)

**Fifteenth Claim:** Negligent infliction of emotional distress against John Doe.  (*Id.* ¶¶  91-92.)

**Sixteenth Claim:** Negligence against John Doe.  (*Id.* ¶¶ 93-94.)

**Seventeenth Claim:** Respondeat superior liability for the actions of John Doe against Delta.  (*Id.* ¶¶ 95-96.)

**Eighteenth Claim:** Breach of contract against Delta. (*Id.* ¶¶ 97-98.)

**Nineteenth Claim:** Violation of the Donnelly Antitrust Act, N.Y. Gen. Bus. Law § 340 *et seq.* ("Donnelly Act"), against Delta and KLM.  (*Id.* ¶¶ 99-100.)

**Twentieth Claim:** Deceptive practices in violation of N.Y. Gen. Bus. Law § 349 against Delta and KLM.  (*Id.* ¶¶ 101-03.)

**Twenty-First Claim:** Violation of Article 17 of the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014, T.S. No. 876 (entered into force in the United States in 1934) ("the Warsaw Convention"), *reprinted in* 49 U.S.C. § 40105 note, against Delta.  (*Id.* ¶¶ 104-05.)

**Twenty-Second Claim:** Violation of Article 19 of the Warsaw Convention against Delta.  (*Id.* ¶¶ 106-107.)

---

[4] The Eleventh and Twelfth Claims in the Amended Complaint are both captioned as "Assault Against Defendant John Doe." (*Id.* ¶¶ 86-86.)  The court will assume for purposes of this motion that plaintiff's Twelfth Claim was intended to be for battery, not assault.

**B. Procedural History**

Following plaintiff's filing of the Amended Complaint on April 16, 2012, on April 30, 2012, defendants, both of which are represented by the same counsel, filed a request for a pre-motion conference concerning Delta and KLM's respective proposed motions to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 21.)  On May 9, 2012, the court granted defendants' request for a pre-motion conference and scheduled a telephone conference for May 17, 2012.  (Order of May 9, 2012.)

On the May 17, 2012, telephone conference, the court ordered Delta to provide plaintiff with a copy of his airline ticket for his January 2, 2011, flights in order for plaintiff to determine the applicability of the Warsaw Convention to certain of his claims.  (Minute Entry of May 17, 2012.)  The court also ordered the parties to file a joint status letter by June 22, 2012, advising the court as to whether the parties reached an agreement as to the applicability of the Warsaw Convention to plaintiff's claims, and to exchange initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1)(C).  (*Id.*)

On June 22, 2012, the parties informed the court that they were unable to agree about the applicability of the Warsaw Convention to plaintiff's claims.  (ECF No. 31, Joint Status

Ltr.)  Accordingly, on June 25, 2012, the court set a briefing
schedule for the instant motions to dismiss, (Order of June 25,
2012), which were fully briefed and filed with the court on
October 3, 2012 (ECF No. 36, Defs.' Mots. to Dismiss).

On August 16, 2012, Magistrate Judge Lois Bloom stayed
discovery between all parties to this action pending
adjudication of Delta and KLM's motions to dismiss.  (Scheduling
Order of Aug. 16, 2012.)

## DISCUSSION

## I.  Standard of Review

### A.  Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "'a
complaint must contain sufficient factual matter, accepted as
true, to state a claim to relief that is plausible on its
face.'" *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677
F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009)).  Although the court must "accept as true all
factual statements alleged in the complaint and draw all
reasonable inferences in favor of the non-moving party,"
*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir.
2007), plaintiff's "[f]actual allegations must be enough to
raise a right to relief above the speculative level," *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed,
"[c]onclusory allegations or legal conclusions masquerading as

factual conclusions will not suffice to [defeat] a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (alterations in original) (internal quotation marks omitted).

## II. **Delta's Motion to Dismiss**

### A. **The Warsaw and Montreal Conventions**

"The Warsaw Convention, to which the United States is a party, applies to all international transportation by air." *Zarlin v. Air Fr.*, No. 04-CV-07408, 2007 U.S. Dist. LEXIS 66288, at *7 (S.D.N.Y. Sept. 6, 2007). "The Warsaw Convention was crafted during the Second International Conference on Private Aeronautical Law of 1929 in order to foster the growth of the nascent commercial airline industry." *King v. Am. Airlines*, 284 F.3d 352, 356 (2d Cir. 2002). "'The cardinal purpose of the Warsaw Convention . . . is to achieve uniformity of rules governing claims arising from international air transportation.'" *Id.* (quoting *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 169 (1999) (internal quotation marks and citations omitted)). "To this end, the Warsaw Convention created a comprehensive liability system to serve as the exclusive mechanism for remedying injuries suffered in the course of the 'international transportation of persons, baggage, or goods performed by aircraft.'" *Id.* at 356-57 (quoting Warsaw Convention art. 1). As the Second Circuit further described in

*King v. American Airlines*,

> [t]his remedial system is designed to protect air carriers against catastrophic, crippling liability by establishing monetary caps on awards and restricting the types of claims that may be brought against carriers, while accommodating the interests of injured passengers by creating a presumption of liability against the carrier when a claim satisfies the substantive requirements of the Convention.

*Id.* at 357 (citing *Tseng*, 525 U.S. at 169-70.

Therefore, in the interest of maintaining uniformity of law regarding passenger claims throughout the commercial airline industry, plaintiffs "must bring their claims under the terms of the Convention or not at all." *Id.* (citing *Tseng*, 525 U.S. at 175-76.) As the Supreme Court confirmed in *El Al Israel Airlines v. Tseng*, "the Convention's preemptive effect on local law extends to all causes of action for injuries to persons or baggage suffered in the course of international airline transportation, regardless of whether a claim actually could be maintained under the provisions of the Convention." *Id.* (discussing *Tseng*, 525 U.S. at 174-76). In other words, "[i]f a passenger's injuries fall within the scope of Article 17 [of the Warsaw Convention], he is either entitled to recovery under the Convention or not at all." *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 370 (2d Cir. 2004) (internal quotation marks omitted).

The most recent iteration of the Warsaw Convention's

remedial system is the treaty commonly referred to as the
Montreal Convention. *See* Convention for the Unification of
Certain Rules for International Carriage by Air, May 28, 1999
(entered into force on Nov. 4, 2003) ("the Montreal
Convention"), *reprinted in* S. Treaty Doc. No. 106-45, 1999
U.S.T. LEXIS 175. Like the Warsaw Convention, the Montreal
Convention "precludes passengers from bringing actions under
local law when they cannot establish air carrier liability under
the treaty." *Tseng*, 525 U.S. at 175. Indeed, Article 29 of the
Convention explicitly states that "[i]n the carriage of
passengers, baggage and cargo, any action for damages, however
founded, whether under this Convention or in contract or in tort
or otherwise, can only be brought subject to the conditions and
such limits of liability as are set out in this Convention."
Montreal Convention art. 29. Thus, "[b]y its own terms, the
[Montreal] treaty, where applicable, preempts the remedies of a
signatory's domestic law, whether or not the application of the
Convention will result in recovery in a particular case." *Best
v. BWIA W. Indies Airways Ltd.*, 581 F. Supp. 2d 359, 362
(E.D.N.Y. 2008); *see also Tseng*, 525 U.S. at 161 ("[R]ecovery
for a personal injury suffered on board [an] aircraft or in the
course of any of the operations of embarking or disembarking, if
not allowed under the Convention, is not available at all."
(internal quotation marks omitted) (alteration in original)).

Although the Montreal Convention "unifie[d] and replace[d] the system of liability that derives from its predecessor, the Warsaw Convention, the Convention still retains many of its original provisions and terms and thus courts have continued to rely on cases interpreting equivalent provisions in the Warsaw Convention." *Hunter v. Deutsche Lufthansa AG*, 863 F. Supp. 2d 190, 205 (E.D.N.Y. 2012) (internal quotation marks omitted); *see also Baah v. Virgin Atl. Airways*, 473 F. Supp. 2d 591, 596 (S.D.N.Y. 2007) ("[T]his Court has previously relied on cases interpreting a provision of the Warsaw Convention where the equivalent provision in the Montreal Convention was substantively the same."); *Paradis v. Ghana Airways Ltd.*, 348 F. Supp. 2d 106, 111 (S.D.N.Y. 2004) ("[T]he preemptive effect is identical regardless of whether the Montreal Convention or the Warsaw Convention . . . applies; thus the Court need not decide which Convention controls."), *aff'd*, 194 Fed. App'x 5 (2d Cir. 2006).

The parties disagree as to whether the Warsaw or the Montreal Convention applies to this case; however, the same legal analysis applies with regard to plaintiff's ability to state a claim under either convention, as well as whether either convention preempts plaintiff's state and common law claims. (*See* Delta Mem. at 1-2 (arguing the Montreal Convention controls); Am. Compl. ¶¶ 104-07 (pleading claims under the

16

Warsaw Convention); *see also* ECF No. 36-4, Mem. in Supp. of Pl.'s Opp. to Delta's Mot. to Dismiss ("Pl.'s Opp. I") at 7.) Thus, for purposes of the instant motion to dismiss, the court will treat the Amended Complaint as having pleaded claims pursuant to either or both the Warsaw and Montreal Conventions.

Additionally, the limitations of both of the Conventions apply to airline employees and the airlines themselves. Article 30 of the Montreal Convention expressly provides:

> In relation to the carriage performed by the actual carrier, any servant or agent of that carrier or of the contracting carrier shall, if they prove that they acted within the scope of their employment, be entitled to avail themselves of the conditions and limits of liability which are applicable under this Convention to the carrier whose servant or agent they are, unless it is proved that they acted in a manner that prevents the limits of liability from being invoked in accordance with this Convention.

Montreal Convention art. 30. "Although the explicit language extending coverage to agents was an addition to the Montreal Convention, courts interpreting [the Warsaw] treaty had extended its conditions and limits of liability to the agents and servants of the air carrier." *Vumbaca v. Terminal One Group Ass'n, L.P.*, 859 F. Supp. 2d 343, 362 (E.D.N.Y. 2012) (citing *Reed v. Wiser*, 555 F.2d 1079, 1089-93 (2d Cir. 1977)); *see also Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Solutions,*

17

*Inc.*, No. 09 Civ. 5935, 2010 U.S. Dist. LEXIS 130929, at *13
(S.D.N.Y. July 23, 2010) ("The Second Circuit has long
interpreted the language of the Warsaw Convention to extend air
carrier liability limitations to air carriers' employees and
contractors."). Thus, the preemptive effect of the Conventions
applies both to plaintiff's individual claims against John Doe,
and to plaintiff's claims against Delta.

**B. Plaintiff Fails to State a Claim Against Delta Pursuant to Article 17 of the Conventions**

The Amended Complaint contains claims pursuant to
Articles 17 and 19 of the Warsaw Convention. (*See* Am. Compl. ¶¶
104-07.) In plaintiff's Affirmation in Opposition to Delta's
Motion, however, plaintiff withdraws his Twenty-Second Claim
against Delta pursuant to Article 19 of the Warsaw Convention.
(ECF No. 36-3, Grant Aff. ¶ 2.) Accordingly, the court hereby
"so orders" plaintiff's withdrawal of the Twenty-Second Claim in
his Amended Complaint.

**1. Article 17 Governs Plaintiff's Claims Against Delta and John Doe**

In plaintiff's opposition to Delta's motion to dismiss
his Article 17 claim, plaintiff paradoxically begins by arguing
that neither the Warsaw nor the Montreal Convention governs his
claims against Delta and John Doe. (*See* Pl.'s Opp. I at 7.)
Rather, plaintiff argues that whether his transportation from
JFK to Accra was "international," as that term is understood in

18

Article 1(2) of each of the conventions, is a question of fact that cannot be resolved prior to the parties' exchange of discovery. (*See id.* at 7-8.) Plaintiff specifically argues that determination of whether plaintiff engaged in "international" transportation pursuant to the Warsaw or Montreal Convention "depends on factual issues such as the delivery of a proper ticket with notice of the applicability of the Conventions, whether Ghana is a High Contracting Party or State Party, and whether plaintiff regarded the travel by successive carriers as a single operation--all resting upon matters outside the pleadings." (*Id.* at 15-16.)

The court respectfully disagrees with plaintiff's contentions regarding international travel for the following reasons:

First, in his Amended Complaint, plaintiff (1) describes this case as an action "for bodily injuries and delays under Articles 17 and 19 of the Warsaw Convention" sustained onboard an aircraft "*during international transportation*," (Am. Compl. ¶ 1 (emphasis added)); (2) invokes the court's subject matter jurisdiction "pursuant to Article 28(1) of the [Warsaw Convention]," (*id.* ¶ 2); and (3) alleges a claim against Delta pursuant to Article 17 of the Warsaw Convention, (*id.* ¶¶ 104-05). Thus, plaintiff's argument regarding the inapplicability of the Warsaw Convention to his claims is belied by plaintiff's

own allegations and averments.  Second, the purported questions

of fact regarding ticketed international travel that plaintiff

claims preclude granting Delta's motion to dismiss are either

questions which plaintiff is himself in the best position to

answer (*e.g.*, his travel itinerary and ticket information, both

of which are in plaintiff's possession), or relate to facts not

alleged in the Amended Complaint (*e.g.*, the possibility

plaintiff's travels could have involved successive carriage

aboard airlines other than Delta).  Lastly, both conventions

provide that "[i]n the carriage of passengers, baggage and

cargo, *any action for damages, however founded*, whether under

this Convention or in contract or in tort or otherwise, can only

be brought subject to the conditions and such limits of

liability as are set out in this Convention."  Montreal

Convention art. 29 (emphasis added); *see* Warsaw Convention art.

1.  Therefore, there can be no question that either the Warsaw

or Montreal Convention governs plaintiff's claims against Delta

and, by extension, John Doe.

> **2.  Plaintiff's Injuries Are Not the Result of an
> "Accident" Pursuant to Article 17**

With regard to plaintiff's Twenty-First Claim, Delta

argues that plaintiff cannot state viable injury claims against

Delta under either the Warsaw or Montreal Conventions because

plaintiff's injuries were not caused by an "accident," as that

term is understood in the context of Article 17 of each
convention.  (*See* Delta Mem. at 13-20.)  The court agrees.

Article 17 of the Warsaw Convention provides that
"[t]he carrier shall be liable for damage sustained in the event
of the death or wounding of a passenger or any other bodily
injury suffered by a passenger, if the accident which caused the
damage so sustained took place on board the aircraft or in the
course of any of the operations of embarking or disembarking."
Warsaw Convention art. 17.  Article 17(1) of the Montreal
Convention similarly provides that "[t]he carrier is liable for
damage sustained in case of death or bodily injury of a
passenger upon condition only that the accident which caused the
death or injury took place on board the aircraft or in the
course of any of the operations of embarking or disembarking."
Montreal Convention art. 17(1).  In light of the substantial
parity of Article 17 of each convention, the court will herein
refer to the Warsaw and Montreal Conventions collectively as
"the Conventions" with regard to Article 17, and will likewise
look to precedent interpreting Article 17 of both conventions.
*See Hunter*, 863 F. Supp. 2d at 205.

Neither of the Conventions define "accident;" however,
in *Air France v. Saks*, 470 U.S. 392 (1985), the Supreme Court
established a definition of "accident."  "For purposes of
Article 17, an accident occurs 'only if a passenger's injury is

21

caused by an unexpected or unusual event or happening that is external to the passenger.  This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries.'" *Cush v. BWIA Int'l Airways Ltd.*, 175 F. Supp. 2d 483, 487 (E.D.N.Y. 2001) (quoting *Saks*, 470 U.S. at 405).  The *Saks* Court further explained that "any injury is the product of a chain of causes, and we require only that the passenger be able to prove that some link in the chain was an unusual or unexpected event *external to* the passenger." *Saks*, 470 U.S. at 406 (emphasis added).  Thus, "courts apply proximate cause analysis in determining whether an unusual event is a 'link in the chain' that led to an 'accident' for purposes of the Warsaw Convention." *Cush*, 175 F. Supp. 2d at 487. Proximate cause analysis requires that plaintiff demonstrate an uninterrupted connection between the external unusual event and his ultimate injury.  *See id.*

Plaintiff argues that the combination of three separate accidents "together caused plaintiff's injuries": (1) Delta's failure to accommodate plaintiff's medical condition and disability, (2) Delta's giving false information to the Port Authority Police, and (3) the Port Authority Police's use of excessive force.  (Pl.'s Opp. I at 1.)  None of these alleged events constitute an "accident" under Article 17.

First, plaintiff does not allege that he has any

disability for which accommodation was necessary.  Rather, the
Amended Complaint contains only a single passing reference to
plaintiff's "leg pain disability," which plaintiff himself
attributes to having stood and sat for a long period of time on
December 29, 2010, and January 2, 2011.  (Am. Compl. ¶ 25.)
True, "an injury resulting from routine procedures in the
operation of an aircraft or airline can be an 'accident' if
those procedures or operations are *carried out* in an
unreasonable manner;" however, there was nothing unreasonable
about Delta declining to allow plaintiff to change seats.
*Fishman by Fishman v. Delta Air Lines*, 132 F.3d 138, 143 (2d
Cir. 1998) (emphasis in original).  Assuming the allegations in
the Amended Complaint are true, the empty seats to which
plaintiff requested to be moved were either located in a
different class of service than the one plaintiff had purchased,
or they were intended for Delta crewmembers only.  In either
case, Delta was not obligated to allow plaintiff to sit in the
empty seats even if plaintiff's leg pain constituted a
disability.[5]  Plaintiff's invocation of *Olympic Airways v.
Husain*, in which the Supreme Court affirmed that a flight

---

[5] Federal regulations regarding seating for passengers with
a disability provide that airlines "are not required to furnish more than
one seat per ticket or to provide a seat in a class of service other than the
one the passenger has purchased in order to provide an accommodation required
by this Part."  14 C.F.R. § 382.87(f); *see also* 14 C.F.R. § 125.211(b)
("[E]ach person on board an airplane operated under this part shall occupy *an
approved* seat or berth." (emphasis added)).

attendant's refusal to reseat to one of eleven open passenger seats an asthmatic plaintiff whose proximity to another passenger's cigarette smoke contributed to the plaintiff's death, is plainly inapposite to this case. *See* 540 U.S. 644, 648 n.2, 652-57 (2004).

Second, an airline employee's giving of false information about a passenger to the police might, in certain circumstances, give rise to liability by the airline for passenger injuries caused by the police. *See Sirico*, 2002 U.S. Dist. LEXIS 1551, at *5 (citing *Turturro v. Continental Airlines*, 128 F. Supp. 2d 170, 182 (S.D.N.Y. 2001)). Here, however, the Amended Complaint fails to allege any false statement to the Port Authority Police by John Doe or any other Delta employee. In his opposition papers, plaintiff argues that "it may be reasonably inferred that Delta reported to the Police false information." (Pl.'s Opp. I at 19.) Plaintiff also argues that he "never left his assigned seat until he was ordered to come to the front of the plane." (*Id.*) Neither of these arguments is supported by the allegations contained in the Amended Complaint, which says nothing about plaintiff having remained in his assigned seat, and establishes that the Port Authority Police were summoned after plaintiff refused to leave the plane when ordered to. (*See* Am. Compl. ¶¶ 32-35.) Thus, the complaint lacks any plausible factual allegation that Delta

24

reported false information about plaintiff to the Port Authority
Police.

Third, the court makes no determination at this time
as to the reasonableness of the force used against plaintiff by
Jane Doe 1 and Jane Doe 2 on behalf of the Port Authority. It
is clear, however, that plaintiff has failed to allege plausible
facts that John Doe or any other Delta employee exercised
control over Jane Doe 1, Jane Doe 2, and the Port Authority,
each of whom are separately named defendants in this case.
Accordingly, the actions of Jane Doe 1 and Jane Doe 2 do not
fall within the Supreme Court's definition of an Article 17
"accident" with regard to Delta and John Doe.

Plaintiff's case is analogous to *Cush v. BWIA Int'l
Airways Ltd.*, decided in this district by Judge Nicholas G.
Garaufis in 2001. The plaintiff, Cush, sued BWIA International
Airways for injuries he sustained when unidentified Guyanese
immigration officials forcibly removed him from a BWIA
international flight preparing to depart from Guyana to New
York. 175 F. Supp. 2d at 484-85. Fearful of Guyanese "black
clothes police," Cush refused to voluntarily leave the aircraft
when ordered to by the Guyanese immigration officials, at which
point Cush was forcibly lifted, thrown, punched, handcuffed, and
pushed from the aircraft by the officials. *Id.* at 485. Cush
thereafter opposed BWIA's motion for summary judgment by arguing

that the immigration officials' decision to revoke his clearance to board the airplane was a "link in the chain" that led to his injuries, thereby rendering Cush's injuries the product of an "accident" pursuant to Article 17 of the Conventions. *See id.* at 487.

Judge Garaufis rejected Cush's argument and granted BWIA summary judgment, finding that "[i]t was not the unusual circumstances of [Cush's] boarding that caused the altercation, but rather his refusal to leave the plane after he had been informed that he was not permitted to travel." *Id.* at 487-88. Judge Garaufis further explained that "when a passenger is forcibly removed after refusing to disembark at the request of airline officials, or at the request of those authorized and accompanied by airline officials, his refusal to disembark, not the decision to remove him, is the proximate cause of his injuries." *Id.* at 488. Thus, having assessed all of the circumstances surrounding Cush's injuries pursuant to *Saks*, Judge Garaufis concluded that "even if the decisions of the immigration officials and the airline representatives created 'unusual' or 'unexpected' circumstances, [Cush's] injuries were not caused by those circumstances and thus were not caused by an 'accident' for purposes of Article 17 of the Warsaw Convention." *Id.* at 489.

Here, as in *Cush*, had plaintiff "complied with his obligation to disembark, he would not have been forcibly removed," and, therefore, would not have suffered any injury. *Id.* at 488.  In his Amended Complaint, plaintiff alleges that he was unequivocally ordered to "get off the plane" by John Doe prior to the arrival of Jane Doe 1 and Jane Doe 2 and his subsequent forcible removal and arrest.  (Am. Compl. ¶ 32.)  The fact that plaintiff responded to John Doe's order by questioning its basis does not change the fact that plaintiff refused to comply with John Doe's order.[6]  Thus, consistent with *Cush* and other analogous precedent, plaintiff's forcible removal as the result of his refusal to comply with Delta's order to disembark the airplane does not constitute an "accident" under Article 17 of the Conventions.  *Id.* at 489; *see also Ginsberg v. Am. Airlines*, No. 09 Civ. 3226, 2010 U.S. Dist. LEXIS 107688, at *11-12 (S.D.N.Y. Sept. 27, 2010) ("[Plaintiff's] own decision to move the cart, which he knew was contrary to the crew instructions and would provoke a confrontation with the flight attendant, was the proximate cause of the incident; the external source element of the definition of accident clearly is not met here."); *Sirico v. British Airways PLC*, No. 98-CV-4938, 2002

---

[6] Nor, contrary to his argument, do plaintiff's alleged personal characteristics differentiate this case from *Cush* or other cases involving a passenger's refusal to cooperate with airline or other officials.  (*See* Pl.'s Opp. I at 22 n.4.)  Plaintiff's personal characteristics are irrelevant to the instant motions.

U.S. Dist. LEXIS 1551, at *4 (E.D.N.Y. Jan. 22, 2002) ("If the
plaintiff did refuse an order to leave the aircraft, that
refusal, not the actions of the airline, would be the proximate
cause of her injuries."); *Schaeffer v. Cavallero*, 54 F. Supp. 2d
350, 352 (S.D.N.Y. 1999) (finding passenger's refusal to
voluntarily disembark domestic flight was proximate cause of his
battery and false imprisonment); *Grimes v. Northwest Airlines,
Inc.*, No. 98-CV-4794, 1999 U.S. Dist. LEXIS 11754, at *8-9 (E.D.
Pa. July 30, 1999) (finding neither plaintiff's disagreement
over seat assignment nor his subsequent removal from plane by
police constituted an "accident" under Article 17); *cf. Zarlin*,
2007 U.S. Dist. LEXIS 66288, at *14-15 (finding plaintiff's
choice to return to seat near another passenger with whom
plaintiff was quarreling was proximate cause of alleged torts
committed by other passenger).

For purposes of the instant motions to dismiss, only
plaintiff's refusal to disembark from the plane can be said to
have proximately caused his alleged injuries.  *See Margrave v.
British Airways*, 643 F. Supp. 510, 513 (S.D.N.Y. 1986) ("[T]he
question of proximate cause may be one for the court where . . .
reasonable jurors could reach only one conclusion regarding the
issue of proximate cause.").  Because plaintiff chose to so
refuse, his subsequent injuries were not caused by an "accident"
for which Delta is liable under Article 17 of the Conventions.

Plaintiff's Article 17 claim against Delta is therefore dismissed.

## C. Plaintiff's Remaining Claims against Delta and John Doe are Preempted

Delta correctly notes that plaintiff does not dispute that to the extent that either of the Conventions applies to his action, common and state-law claims are preempted. (*See generally* Pl.'s Opp. I.)  Because Article 17 of the Conventions applies to plaintiff's suit, his remaining claims against Delta and John Doe are preempted and, therefore, dismissed. *See Tseng*, 525 U.S. at 161.

### 1. Plaintiff's Federal and Common Law Claims

Plaintiff's Tenth Claim against John Doe for violations of plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 is preempted by the Conventions. *See King*, 284 F.3d at 361 (declining to "carve out an exception for civil rights actions as a matter of policy" and therefore finding claims pursuant to 42 U.S.C. § 1981 preempted by the Warsaw Convention).  Furthermore, plaintiff does not allege, and cannot in good faith allege, that John Doe's conduct was undertaken under the color of state law. *See* 42 U.S.C. § 1983.  Thus, plaintiff's Section 1983 claim must be dismissed.

Plaintiff's common law claims against John Doe for assault, battery, false imprisonment, and breach of contract in

Claims Eleven, Twelve, Thirteen, and Eighteen, respectively, are likewise preempted by the Conventions. *See* Warsaw Convention art. 1; Montreal Convention art. 29. Those common law claims are therefore dismissed.

Plaintiff's Fourteenth Claim for intentional infliction of emotional distress, and Fifteenth Claim for negligent infliction of emotional distress against John Doe are also preempted by Article 17 of the Conventions and are dismissed. Plaintiff alleges to have experienced "terror, fear, humiliation, indignity, invasion of privacy, anxiety, stress, emotional and mental upset, injury . . . subject[ion] to scorn and ridicule, and was publicly treated like a criminal." (Am. Compl. ¶ 57.) In *Eastern Airlines v. Floyd*, however, the Supreme Court held that "an air carrier cannot be held liable under Article 17 when an accident has not caused a passenger to suffer death, physical injury, or physical manifestation of injury." 499 U.S. 530, 552 (1991). The Second Circuit has further explained that Article 17 "permits passengers to hold a carrier liable for a mental injury only to the extent that it was caused by a physical injury" during an accident within the meaning of the Conventions. *Ehrlich*, 360 F.3d at 385; *see also Vumbaca v. Terminal One Group Ass'n, L.P.*, 859 F. Supp. 2d 343, 365 (E.D.N.Y. 2012) (same); *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 488 (S.D.N.Y. 2009) (The Montreal

Convention "only permits a damages remedy in the event of death, bodily injury, damage to baggage or cargo, or delay; any other injury allegedly suffered as a result of a carrier's willful conduct is not actionable."). Here, plaintiff has not alleged that his mental injuries were caused by his physical injuries. (*See* Am. Compl. ¶¶ 66-69.) Thus, plaintiff's common law emotional distress claims against John Doe are preempted and, therefore, dismissed.

### 2. Plaintiff's New York State Law Claims

Plaintiff's Nineteenth and Twentieth Claims pursuant to New York General Business Law relate to Delta's alleged involvement in antitrust violations and deceptive business practices as part of KLM's refusal to sell plaintiff a plane ticket following plaintiff's release from the hospital on January 2, 2011. (Am. Compl. ¶¶ 99-103.) Plaintiff specifically alleges that Delta colluded with KLM and other members of Delta's SkyTeam to "interfere with competition and prevent Plaintiff from purchasing from other members of their cartel" in violation of the Donnelly Antitrust Act, General Business Law § 340. (*Id.* ¶ 100.) Plaintiff also alleges that Delta engaged in deceptive trade practices in violation of General Business Law § 349.[7] (*Id.* ¶ 103.) Because these claims

---

[7] Curiously, plaintiff's New York General Business Law deceptive practices claim alleges that "Delta's acts constituted a per se deceptive practice as those actions were not in compliance with the Air Carrier Access

arise from events that occurred after plaintiff was "on board
the aircraft or in the course of any of the operations of
embarking or disembarking," they fall outside the ambit of the
Conventions.  Montreal Convention art. 17(1).

Plaintiff's General Business Law claims are
nonetheless expressly preempted by the Airline Deregulation Act
of 1978, 49 U.S.C. § 41713(b) ("the ADA").[8]  The ADA provides
that states "may not enact or enforce a law, regulation, or
other provision having the force and effect of law related to a
price, route, or service of an air carrier."  49 U.S.C. §
41713(b)(1).  The purpose of the ADA's preemption provision is
"[t]o ensure that the States [do] not undo federal deregulation
with regulation of their own."  *Morales v. TWA*, 504 U.S. 374,
378 (1992); *see also In re Air Cargo Shipping Servs. Antitrust
Litig.*, 697 F.3d 154, 160 (2d Cir. 2012) (quoting *Morales*).

Further, a majority of the circuit courts to have
construed the term "service" in the ADA's preemption provision
"have held that the term refers to the provision or anticipated
provision of labor from the airline to its passengers and

---

Act," 49 U.S.C. § 41705 ("ACAA").  (Am. Compl. ¶ 102.)  As Delta correctly
notes, however, even assuming that plaintiff intended to allege a separate
ACAA claim in addition to his deceptive practices claim, the Second Circuit
has held that "the text and structure of the ACAA manifests no congressional
intent to create a private right of action in a federal district court."
*Lopez v. Jet Blue Airways*, 662 F.3d 593, 597 (2d Cir. 2011).  The ACAA's lack
of a private cause of action also further underscores plaintiff's inability
to allege a disability discrimination claim against Delta.

[8] Contrary to plaintiff's argument, legal preemption is a question
of law, not of fact.  (Pl.'s Opp. I at 24.)

32

encompasses matters such as boarding procedures, baggage handling, and food and drink--matters incidental to and distinct from the actual transportation of passengers." *Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008); *see also Smith v. Comair, Inc.*, 134 F.3d 254, 258-59 (4th Cir. 1998) ("If passengers could challenge airlines' boarding procedures under general contract claims alleging failure to transport, we would allow the fifty states to regulate an area of unique federal concern--airlines' boarding practices."). An airline's ticketing practices and procedures also constitute a "service of an air carrier." *See Travel All Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir. 1996); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (*en banc*); *see also Bary v. Delta Airlines, Inc.*, No. 02-CV-5202, 2009 U.S. Dist. LEXIS 94797, at *40 (E.D.N.Y. Oct. 9, 2009) (citing *Hodges*).

There can be no question that plaintiff's challenge to Delta's ticketing and boarding procedures under New York consumer protection laws is preempted by the ADA. Indeed, at least one New York state court has held that New York's consumer protection statutes, including General Business Law § 349, cannot be invoked against airlines due to federal preemption. *See Stone v. Continental Airlines*, 10 Misc. 3d 811, 814 (N.Y. Civ. Ct. N.Y. Cnty. 2005). Therefore, plaintiff's New York

General Business Law claims are preempted by the ADA and are, therefore, dismissed.

## III. **KLM's Motion to Dismiss**

The Amended Complaint contains two state-law claims against KLM for its refusal to sell plaintiff a ticket following his release from the hospital on January 2, 2011: (1) violation of New York's Donnelly Act for "collude[ing] with Delta and other members of Delta's 'SkyTeam partnership' to interfere with competition and prevent Plaintiff from purchasing [a ticket] from other members of their cartel," and (2) violation of General Business Law § 349 for engaging in deceptive trade practices. (Am. Compl. ¶¶ 99-103.) KLM argues in its motion to dismiss that the claims against KLM are, like those against Delta, preempted by the ADA. (ECF No. 36-7, Mem. of Law in Supp. of KML's Mot. to Dismiss ("KLM Mem.") at 6-7.) Plaintiff opposes KLM's motion in a terse and incomprehensible memorandum that fails to address his Donnelly Act claim. (*See generally* ECF No. 36-9, Mem. of Law in Supp. of Pl.'s Opp. to KLM's Mot. to Dismiss ("Pl.'s Opp. II") at 3-4.) The court agrees that plaintiff's General Business Law claims against KLM are preempted by the ADA and must, therefore, be dismissed.

Unlike Delta, KLM is a foreign, rather than domestic, air carrier. Until recently, the Second Circuit had not addressed whether the ADA's preemption provision applies to

34

foreign as well as domestic air carriers.  *Cf. In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 693, 696 (9th Cir. 2011) (finding that "Congress intended to prevent states from regulating foreign air carriers" and holding that "the ADA's preemption of state regulation covers regulation of all air carriers, whether domestic or foreign").  On October 11, 2012, however, the Second Circuit issued a decision in the case *In re Air Cargo Shipping Servs. Antitrust Litig.*, in which the Circuit held that "the preemption provision should be read to preempt state-law antitrust suits against foreign as well as domestic air carriers."  697 F.3d at 160.  The Circuit explained that applying the ADA's preemption provision to foreign carriers was logical given that "[a]llowing the states to regulate only foreign air carriers would be particularly peculiar since '[f]oreign commerce is pre-eminently a matter of national concern.'"  *Id.* at 163 (quoting *Japan Line, Ltd. v. Cnty. of L.A.*, 441 U.S. 434, 448-49 (1979)).

Therefore, for the reasons discussed in Section II.C.2., *supra*, KLM's motion to dismiss claims Nineteen and

Twenty in the Amended Complaint is granted.[9]

## CONCLUSION

For the foregoing reasons, Delta's and KLM's Rule
12(b)(6) motions to dismiss are granted in their entirety, and
claims Ten through Twenty-Two of the Amended Complaint are
dismissed with prejudice. *See Wilson v. Merrill Lynch & Co.*,
671 F.3d 120, 140 (2d Cir. 2011) ("[W]here amendment would be
futile, denial of leave to amend is proper."); *McCarthy v. Dun &
Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("[I]t is
within the sound discretion of the district court to grant or
deny leave to amend."). Accordingly, the Clerk of the Court is
respectfully directed to dismiss Delta, KLM, and John Doe from
this action.

---

[9] Even if plaintiff's Donnelly Act claim against KLM and Delta was
not preempted by the ADA, this claim would nonetheless be dismissed for
plaintiff's failure to sufficiently plead the elements of a Donnelly Act
claim, none of which are discussed in the Amended Complaint. *Compare Shaw v.
Club Mgrs. Assn. of Am., Inc.*, 84 A.D.3d 928, 929 (N.Y. App. Div. 2d Dep't
2011) ("To sufficiently state a violation of General Business Law § 340, a
party must allege a conspiracy or a reciprocal relationship between two or
more legal or economic entities, identify the relevant market affected,
describe the nature and effect of the alleged conspiracy and the manner in
which the economic impact of that conspiracy restrains trade in the market."
(quotation marks omitted)), *with* Am. Compl. ¶¶ 99-103.

Plaintiff's deceptive practices claim against KLM and Delta would
likewise be dismissed for plaintiff's failure to sufficiently plead the
requisite elements. *Compare Oswego Laborers' Local 214 Pension Fund v.
Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995) ("[Plaintiffs] must
demonstrate that the [allegedly deceptive] acts or practices have a broader
impact on consumers at large. Private contract disputes, unique to the
parties, for example, would not fall within the ambit of the statute."), *with*
Am. Compl. ¶¶ 99-103.

Plaintiff and the Port Authority are referred to Magistrate Judge Bloom for the continuation of discovery on plaintiff's remaining claims against the Port Authority, Jane Doe 1, and Jane Doe 2.

**SO ORDERED.**

Dated:     August 27, 2013
           Brooklyn, New York

_____/s/_____
Kiyo A. Matsumoto
United States District Judge
Eastern District of New York